```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
```

|  |  |
|---|---|
| JODIE ANN GAGNON, ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | CIVIL ACTION NO. |
| ) | 1:11-CV-10481-PBS |
| Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

March 27, 2012

SARIS, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Jodie Ann Gagnon ("Gagnon"), who suffers from mental impairments[1] including Panic Disorder, Post Traumatic Stress Disorder ("PTSD"), and Obsessive Compulsive Disorder ("OCD"), seeks review of the decision denying her application for Social Security disability (SSD/Title II) and Supplemental Security Income (SSI/Title XVI) benefits. Gagnon argues that: (1) the Administrative Law Judge ("ALJ") failed to give proper weight to the treating sources' account of Gagnon's disabilities; (2) the ALJ's unfavorable credibility finding was not supported

---

[1] Gagnon also has various physical ailments not at issue in this appeal.

1

by substantial evidence; and (3) the ALJ's vocational conclusions were not supported by substantial evidence.  For the reasons set forth below, the Court **DENIES** Gagnon's motion for remand, and **ALLOWS** the Commissioner's motion to affirm the decision.

## II. Facts

Gagnon is a 41-year-old divorced female.  (R. at 120, 130.)  She has an 8th grade education, and worked as a part-time nursery school attendant from 2002 to 2005 and as a full-time shift manager at McDonald's from 2007 to 2008. (R. at 147.)  As a nursery school attendant, Gagnon worked 5 hours a day, 5 days a week, organizing and leading activities for the children, assisting the children with eating, resting, toileting, removing their coats, and other daily activities.  (R. at 147, 163.)  As a shift manager at McDonald's, Gagnon worked 8 hours a day, 5 days a week, performing duties such as opening up the restaurant, handling money, and managing employees.  (R. at 32, 147.)  However, Gagnon suffered from anxiety so that she was frequently required to take breaks outside.  (R. at 38.)  Gagnon eventually left her position at McDonald's because she felt too anxious driving to work.  (R. at 240, 275.)  Gagnon let her driver's license expire because of the anxiety she experiences while driving.  (R. at 122.)

Since March 1, 2008, Gagnon has been unemployed and has not received any income or health insurance for medical expenses.

(R. at 122, 143.)  Gagnon describes her daily routine as uneventful.  She sends her daughter and her boyfriend's children off to school, goes grocery or clothes shopping if the stores are uncrowded, performs her household chores, watches television, and uses the computer at home.  (R. at 154, 275.)  Gagnon seldom leaves her apartment due to anxiety driving and being around large crowds of people.  (R. at 158.)

Gagnon's mental impairments manifest themselves in the form of panic attacks (which include hyperventilation, AEB racing heart, and extreme fear), hypervigilence, recurrent thoughts and repetitive behaviors, insomnia, flashbacks, and nightmares.  (R. at 279.)  For instance, Gagnon is constantly checking that doors are locked, "ritually" washing her hands, and calling her daughter to ensure that she is safe.  (R. at 191-99, 201-06, 242.)  Gagnon's treating sources have diagnosed these symptoms as panic disorder, PTSD, OCD, and depression, which partly stem from being raped as an adolescent.  (R. at 205, 241.)  Additionally, Gagnon has a history of substance abuse (specifically, opioid dependence) as a result of the sexual abuse.  (R. at 224, 241.)

Gagnon was hospitalized at Charles River Hospital four times during her teenage years due to psychiatric problems.  (R. at 241, 274.)  She later sought treatment for her drug dependency twice in Cambridge, Massachusetts and then at Habit OPCO, a methadone maintenance program.  (R. at 241.)  According to Habit

3

OPCO records, Gagnon's last opiate abuse occurred in 2000. (R. at 241.) Gagnon then received outpatient treatment with Dr. Diana Carlson at Stoneybrook Counseling Center from 2005 to 2006, when she was initially diagnosed with panic disorder and PTSD. (R. at 190.) Gagnon was also determined to have a moderate overall impairment based on a global assessment functioning ("GAF") score in the 53-57 range. (R. at 190-215.) Although she appeared to be "motivated in treatment", Gagnon's case was closed on February 1, 2007 due to her failure to attend appointments. (R. at 189, 203.)

In March 2008, Gagnon began psychiatric treatment at Lowell Community Health Center where she has worked with therapist Catherine Tager, MSW, nurse Margaret Burke Regan, APRN, and psychiatrist Dr. Andrew Aldridge. On an intake note dated March 18, 2008, she received GAF scores of "65; 55; [and] 70" by Nurse Regan. (R. at 281.) On July 9, 2009, Dr. Aldridge and Ms. Tager diagnosed her with Panic Disorder, PTSD, and OCD, and prescribed her Lamictal, Gabapentin, Klonopin, and Anafranil. (R. at 270.) They assigned her GAF scores in the 53-55 range, indicating that she is moderately impaired in most areas of life functions. (R. at 270, 307.) Dr. Aldridge anticipated that Gagnon's impairments or treatment would cause her to be absent more than four days per month from work. (R. at 312.) In a mental residual functional capacity questionnaire, dated January 13, 2010, Dr. Aldridge

4

listed Gagnon as unable to meet competitive standards in eight areas of mental abilities and aptitudes needed to perform unskilled work, seriously limited but not precluded in seven areas, limited but satisfactory in three areas, and unlimited or very good in only one area.  (R. at 309-10.)

Gagnon was also evaluated in person by SSA consultant Dr. Michael Bohnert, on November 23, 2008.  Dr. Bohnert diagnosed Gagnon's symptoms as a mixed anxiety disorder with hypochondriacal concerns, a panic disorder with mild agoraphobia, and moderately severe OCD symptoms.  (R. at 244.)  However, when Dr. Bohnert asked if she feels she could work or not, Gagnon responded, "Depending on what it was."  (R. at 241.)

Gagnon's records were also reviewed by two state agency reviewers Dr. Russell Phillips, Ph.D., on December 24, 2008, and Dr. S. Fischer, Psy.D., on July 24, 2009.  Dr. Phillips concluded that Gagnon's anxiety "continues to impose severe limitations," including moderate limitation in her daily living, concentration, persistence and pace, as well as mild limitation in social functioning.  (R. at 255, 260.)  Despite these limitations, Dr. Phillips determined that she can recall simple and complex information, maintain attention for two hours at a time with normal supervision, and tolerate minimum social demands and simple changes in routine.  (R. at 260.)  Dr. Fischer concluded that Gagnon has an anxiety disorder causing mild restriction on

5

her daily living, and moderate limitation in social functioning, concentration, persistence, and pace. (R. at 296, 301.) With these limitations, Dr. Fischer stated that Gagnon can understand and remember simple instructions, carry out simple instructions in a normal workday, interact around work-related issues, and adapt to routine stressors. (R. at 296, 301.)

### III. Procedural History

Gagnon applied for Social Security disability (SSD/Title II) and Supplemental Security Income (SSI/Title XVI) benefits on July 31, 2008. She alleged disability beginning March 1, 2008. Her application was denied on January 9, 2009. Her request for reconsideration was subsequently denied on July 24, 2009. Gagnon requested an administrative hearing, which was held on July 22, 2010.

The ALJ issued an unfavorable decision on September 24, 2010. The ALJ found that Gagnon has the residual functional capacity to understand and remember simple complex instructions, to concentrate for 2-hour periods in an 8-hour day on simple tasks, to interact appropriately with co-workers and supervisors, but with a need to avoid frequent contact with the general public in a work setting, and with the ability to adapt to changes in a work setting. (R. at 11-12). The ALJ concluded that there are jobs that exist in significant numbers in the national economy that Gagnon can perform, such as a sticker and sealer of

packages.  (R. at 13-14.)

In making his decision, the ALJ gave less weight to the opinions of Gagnon's treating sources Dr. Aldridge and Ms. Tager, stating they were inconsistent with Gagnon's GAF score of 55 and other substantial evidence in the record.  (R. at 13.)  The ALJ gave "great weight" to the assessments of the state agency reviewers Dr. Phillips and Dr. Fischer.  (R. at 12.)  He gave "less weight" to the opinion of Dr. Andrew Aldridge, the treating psychiatrist.  (R. at 12, 13.)  The ALJ also found Gagnon not credible, stating that her "symptoms do not limit her activities to the extent alleged."  (R. at 13.)  The ALJ based this finding on the reports from Drs. Phillips, Fischer, and Bohnert, as well as Gagnon's "ability to perform a wide and varied range of activities of daily living, including driving, shopping, cleaning, going online, playing games, and watching television," her "history of non-compliance with her psychological counseling," and her GAF score.  (R. at 13.)

The Decision Review Board did not complete its review of the ALJ's decision within the 90-day time period allotted, rendering it final on January 19, 2011, subject to judicial review.  See 20 C.F.R. § 405.420(a)(2).

### IV. Standard

**A. Disability Determination Process**

To be eligible for Social Security disability benefits, an

individual must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An impairment is only disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 423(d)(3).

The Commissioner has developed a five-step sequential evaluation process to determine whether a person is disabled. See 20 C.F.R. § 404.1520(a)(4); see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  Step one considers the claimant's work activity–if the claimant is engaged in "substantial gainful activity," then he is not disabled.  § 404.1520(a)(4)(I).  Alternatively, if the claimant is not so engaged, the decisionmaker proceeds to step two, which determines whether the claimant has a medically severe impairment.  See § 404.1520(a)(4)(ii); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).  To establish a severe impairment, the claimant must "show that [he] has an 'impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'" Bowen, 482 U.S. at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

8

If the claimant successfully establishes a severe impairment, the third step determines "whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity." <u>Id.</u> at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). If so, the claimant is conclusively presumed to be disabled. <u>Id.</u> If not, the fourth step evaluates whether the impairment prevents the claimant from performing his past work. <u>Id.</u>  A claimant is not disabled if that claimant is able to perform his past work. <u>Id.</u> (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).  If a claimant cannot perform this work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." <u>Id.</u> at 142.  If the Commissioner fails to meet this burden, the claimant is entitled to benefits.  <u>Id.</u>

**B. Standard of Review**

In reviewing SSDI determinations, district courts do not make *de novo* determinations. <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).  Instead, the Court "must affirm the [ALJ's] findings if they are supported by substantial evidence." <u>Cashman v. Shalala</u>, 817 F. Supp. 217, 220 (D. Mass. 1993)(citing 42 U.S.C. § 405(g)); <u>see also</u> <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir.

9

1987).

In addition to considering whether the ALJ's decision was supported by substantial evidence, a court must consider whether the proper legal standard was applied.  "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal."  Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)).

### V. Discussion

Gagnon contends that the ALJ's residual functional capacity ("RFC") assessment that she was capable of certain work was not supported by substantial evidence.  She argues that the ALJ erred in two main ways: first, by not assigning controlling weight to the opinion of Gagnon's treating sources, Dr. Aldridge and Ms. Tager, and, second, by not properly considering Gagnon's own subjective description of her symptoms.

**A. The Treating Sources' Opinions**

Gagnon argues that the ALJ's decision should be reversed because he violated the "treating physician rule" by failing to accord controlling weight to Dr. Aldridge's and Ms. Tager's opinions which state that Gagnon's mental impairments were disabling.  Dr. Aldridge reported, among other things, that

10

Gagnon suffers from Panic Disorder, PTSD, and OCD, and that her impairments or treatment would cause her to be absent more than four days per month from work.  (R. at 312.)

A treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as a patient's own physician, psychologist, or other acceptable medical source who has provided medical treatment in an ongoing way.  A treatment provider's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  § 404.1527(d)(2); see also Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002).  When a treating source's opinion is not given controlling weight, the ALJ must then determine the amount of weight based on factors that include the length of the treatment relationship, the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist in the field.  § 404.1527(d). The ALJ, in his opinion, must give "good reasons" for the weight he ultimately assigns to the treating source opinion.  Id.

A therapist is not among the "acceptable medical sources" listed in the Social Security Regulations, see 20 C.F.R. §§

11

404.1513(a), 416.913(a), and an ALJ is granted wide discretion in weighing a therapist's opinion. See SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). A therapist's opinion does not deserve "controlling weight" but may be useful "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." Alcantara v. Astrue, 257 Fed. Appx. 333, 334-35 (1st Cir. 2007). When deciding how much weight to give a therapist's opinion, an ALJ is only constrained by the duty to reach a conclusion supported by substantial evidence in the record. See 20 C.F.R. § 416.927(d)(2) (stating that if a medical source opinion is inconsistent with the administrative record, it should be afforded less weight).

As Gagnon's psychiatrist, Dr. Aldridge's opinion is entitled to controlling weight if it is well-supported by medically acceptable techniques and is not inconsistent with other substantial evidence in the record.[2] The ALJ rejected Dr. Aldridge's opinion because he deemed it inconsistent with Gagnon's GAF score of 55 and with the record as a whole. Specifically, the ALJ gave less weight to Dr. Aldridge's contention that Gagnon "is unable to meet competitive standards

---

[2] As Gagnon's therapist, however, Ms. Tager's opinion is not entitled to controlling weight, and the ALJ has discretion to give it less weight if not supported by substantial evidence in the record. For the same reasons I uphold the ALJ's finding giving Dr. Aldridge's limited weight, the ALJ did not abuse its discretion when affording Ms. Tager's opinion only limited weight.

12

in several areas of functioning, and that she would require four or more absences from work per month." (R. at 13.) The ALJ stated that a GAF score of 55 "is not consistent with inability to meet competitive standards and a likelihood that one will be absence [sic] from work 4 or more times a month due to mental impairment." (Id.)

"A GAF score represents 'the clinician's judgment of the individual's overall level of functioning. The GAF score is taken from the GAF scale, which 'is to be rated with respect only to psychological, social, and occupational functioning.'" Dietz v. Astrue, No. 08-30123, 2009 WL 1532348, at *6 fn. 4 (D. Mass. 2009)(quoting DSM-IV-TR at 32, 34 (appendix)). "[GAF] scores may be of help in assessing functional ability, although they are not determinative." Id. at *6. A GAF score between 51 and 60 is consistent with moderate symptoms and "moderate difficulty in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 31 (4th ed. 1994).

While Gagnon's GAF score by itself may not be determinative, when taken together with the record as a whole, the ALJ's decision to give less weight to Dr. Aldridge's opinion is supported by substantial evidence. The ALJ relied on other medical evidence of record, notably, the opinions of the state agency reviewers Drs. Phillips and Fischer and SSA consultant Dr.

13

Bohnert.  Despite recognizing Gagnon's mental limitations, both state agency reviewers concluded that Gagnon could perform basic work-related tasks.  (R. at 260, 306.)  While neither state agency reviewer evaluated Gagnon in person, Dr. Bohnert did. When determining that Gagnon had the RFC permitting her to work, the ALJ specifically relied on her comment to Dr. Bohnert that whether she could work "depends on what the job was." (R. at 14.) The ALJ also relied on Gagnon's ability "to perform a wide and varied range of activities of daily living, including driving, shopping, cleaning, going online, playing games, and watching television." (R. at 13.)  There is scant-to-no evidence to support a claim of disability beginning in March 2008.

In light of the foregoing, the court concludes that substantial evidence supports the ALJ's finding to provide less weight to Dr. Aldridge's opinion because it is inconsistent with other substantial evidence in the record.  The ALJ provided good reasons for assigning Dr. Aldridge's opinion only "some weight," namely that it was not consistent with Gagnon's GAF score and the record as a whole.  See Lema v. Astrue, 2011 U.S. Dist. LEXIS 37319, at *3 (D. Mass. Mar. 21, 2011) (affirming ALJ finding that treating psychiatrist's opinion not deserving of controlling weight because inconsistent with GAF scores and the record as a whole).

**B. Gagnon's Description of her Symptoms**

Gagnon also contends that the ALJ erred when finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. An ALJ's credibility determination is entitled to deference as long as the ALJ makes specific findings as to the relevant evidence considered in deciding whether to believe the plaintiff. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). In this case, the ALJ concluded that the evidence in the record demonstrated that Gagnon's symptoms did not limit her activities and ability to work to the extent she alleged. (R. at 13.) In making that determination, the ALJ relied on Gagnon's statements that she is able to perform a wide range of activities of daily living, her history of missing therapy appointments, the opinions of Drs. Phillips, Fischer, and Bohnert, and her GAF scores. (Id.) Because the ALJ made specific findings regarding what evidence he considered when assessing Gagnon's credibility, this Court must give deference to and uphold his determination.

## C. ALJ's Vocational Conclusions

Finally, Gagnon contends that the ALJ's vocational conclusions were not supported by substantial evidence. Because Gagnon had met her burden of showing that she is unable to perform any of her past work, (see R. at 14.), the burden shifted

to the Commissioner to prove that Gagnon "is able to perform other work in the national economy in view of [her] age, education, and work experience." 482 U.S. at 142. The opinion of a vocational expert qualifies as substantial evidence to prove that a claimant is able to perform other work in the national economy. See <u>Espada-Rosado v. Comm'r of Soc. Sec.</u>, 25 Fed. Appx. 5, 6 (1st Cir. 2001) (per curiam). In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations. See <u>Arocho v. Sec'y of Health & Human Servs.</u>, 670 F.2d 374, 375 (1st Cir. 1982).

To prove Gagnon's ability to work, the ALJ relied on the testimony of vocational expert Violeta Beer.[3] In response to a hypothetical from the ALJ assuming Gagnon could understand and remember simple instructions, concentrate for two-hour periods over an eight-hour day on simple tasks, interact appropriately with co-workers and supervisors, and adapt to changes in the work setting, Beer testified that Gagnon could perform work as a buckle inserter, a button spindler, a sticker, and a package sealer, among other positions. (R. at 55-56.) Based on this response, the ALJ concluded that Gagnon has the RFC to perform these types of jobs. (R. at 13-14.)

---

[3] While the ALJ's decision refers to the vocational expert as "Kathleen A. Beer", (R. at 14), she was duly sworn in at the hearing as "Violeta G. Beer." (R. at 54).

16

Gagnon claims that the ALJ's hypothetical overstated her mental capacity to work.  To the contrary, the ALJ's description of Gagnon's limitations in the hypothetical is supported by substantial evidence in the record.  The ALJ's conclusions regarding Gagnon's mental ability to work were based on the opinions of Drs. Phillips, Fischer, and Bohnert, as well as her GAF scores.  Based on this evidence, the ALJ's hypothetical accurately described Gagnon's limitations, and the government met its burden to prove that Gagnon is able to perform other work in the national economy.  See <u>Sousa v. Astrue</u>, 783 F. Supp. 2d 226, 235 (D. Mass. 2011) (holding government met its burden that social security claimant was able to perform certain jobs when ALJ relied on testimony of vocational expert).

## VI. Order

Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 15) is **ALLOWED**, and Plaintiff's Motion for Remand (Doc. No. 11) is **DENIED**.

<u>/s/ PATTI B. SARIS</u>
Patti B. Saris
United States District Judge
